## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DAVID DANIELS,

      Plaintiff,

        v.                      Case No.

UNIVERSITY OF MICHIGAN, UNIVERSITY     Hon.
OF MICHIGAN BOARD OF REGENTS, and
MAUREEN BURKE, Lead Police Officer,
University of Michigan Division of Public Safety
and Security, DAVID GIER, Dean, University
of Michigan School of Music, Theater and Dance,
GLORIA HAGE, Senior Associate General Counsel,
University of Michigan, MARTIN PHILBERT, former
Provost, University of Michigan, MARGIE PILLSBURY,
Lead Police Officer, University of Michigan Division of
Public Safety and Security, MARK SCHLISSEL,
former President of the University of Michigan and
current Professor of Molecular, Cellular, and Developmental
Biology, University of Michigan, and ELIZABETH SENEY,
Title IX Coordinator, Sexual and Gender-Based Misconduct
Director, University of Michigan, *all sued  in their personal
and official capacities,* and ANDREW LIPIAN, an individual,
 *sued in his personal capacity,*

      Defendants.

_____/

FRANCYNE STACEY (P33225)
STACEY LAW PRACTICE
*Attorney for Plaintiff*
455 E. Eisenhower Pkwy, Ste 300
Ann Arbor, MI 48108
(734) 821-8088
francyne@staceylawpractice.com

JAY D. MUKERJI (P83218)
ARBOR LAW PLLC
*Attorney for Plaintiff*
455 E. Eisenhower Pkwy, Ste 300
Ann Arbor, MI 48108
(734) 773-0087
attorney@arborlaw.com

_____/

DocuSign Envelope ID: 1E8C76ED-E938-42C4-9E3F-2F2D66D5CE39

There is no other pending or resolved civil action arising out of the transaction or occurrence alleged in the complaint.

## VERIFIED COMPLAINT AND JURY DEMAND

Plaintiff, David Daniels, by and through his attorneys, Stacey Law Practice, PLLC and Arbor Law PLLC, states the following:

## INTRODUCTION

1. Plaintiff, David Daniels, is a world-renowned opera singer and was a tenured professor in the School of Music, Theatre and Dance ("SMTD") at the Defendant, University of Michigan ("U of M").

2. Plaintiff is a gay man.

3. Before being hired by U of M in 2015, Plaintiff had sung in opera houses around the world and is credited with bringing the countertenor voice back to operatic performances.

4. From the beginning of his singing career, Plaintiff refused to hide his identity as a gay man.

5. Plaintiff made his professional singing debut in 1992.

6. Among many awards and accolades, a few stand out. In 1997, Plaintiff won the Richard Tucker Award. The Richard Tucker Award is conferred annually upon a single artist who has reached a high level of artistic accomplishment and who, in the opinion of a conferral panel, is on the threshold of a major international career.

7. In 1999, Plaintiff made his debut with the Metropolitan Opera.

8. The opera, Oscar, about the life of Oscar Wilde, was written for Plaintiff, who created and sang the role at the world premiere with the Santa Fe Opera in July 2013, and again with Opera Philadelphia in February 2015.

9. On June 21, 2014, Plaintiff married his husband in a ceremony conducted by United

DocuSign Envelope ID: 1E8C76ED-E938-42C4-9E3F-2F2D66D5CE39

States Supreme Court Justice and opera fan, Justice Ruth Bader Ginsburg.

10.     In the fall of 2015, Plaintiff joined the faculty of the University of Michigan as a Professor at the School of Music, Theatre & Dance in Ann Arbor, Michigan.

11.     On May 17, 2018, Plaintiff was granted tenure.

12.     On March 26, 2020, Defendants, among other illegal acts, breached Plaintiff's contract and terminated his tenured employment with U of M.

13.     Plaintiff brings this action against Defendants for violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983, and state law violations including breach of express and implied contract, civil conspiracy, violation of the Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. 37.2201 et seq., intentional infliction of emotional distress and interference with business expectancy.

14.     Defendants, personally and in their official capacities intentionally engaged in illegal, unfair, discriminatory, and egregious conduct when it dismissed Plaintiff and engaged in conduct designed to ruin Plaintiff's reputation and ensure his dismissal.

15.     Upon information and belief, Plaintiff is the only tenured faculty member to be dismissed from U of M in the sixty years since it put a dismissal process in place.

16.     Upon information and belief, all other tenured faculty members facing the prospect of dismissal receive at least a year's severance pay which Defendants flatly refused to offer Plaintiff.

## **JURISDICTION AND PARTIES**

17.     Plaintiff is a resident of Ann Arbor, Michigan.

18.     U of M is a publicly funded and state-operated university with its main campus located in Ann Arbor, Michigan. It receives both state and federal funding to provide higher education.

19.     U of M violated Plaintiff's rights when it, among other things, breached its contractual/tenure obligations to Plaintiff; violated Plaintiff's due process, equal protection and

rights to privacy; treated Plaintiff differently than similarly situated heterosexual administrators and tenured faculty; and intentionally embarrassed, humiliated, and degraded Plaintiff.

20.     Defendant, University of Michigan Board of Regents ("Board of Regents"), is the publicly elected governing body of U of M.

21.     The Board of Regents violated Plaintiff's rights when they, among other things, violated Plaintiff's due process, equal protection and privacy rights; violated state law as noted below; and engaged in conduct intended to embarrass, humiliate and degrade Plaintiff.

22.     Defendant Maureen Burke ("Burke") is a Lead Police Officer with U of M's Division of Public Safety and Security.  She is sued in her personal and official capacities.

23.     Burke violated Plaintiff's rights when, unbeknownst to Plaintiff, she assisted the Houston, Texas police department with a criminal investigation involving Plaintiff when that investigation did not involve a student, faculty member, or employee of U of M; violated Plaintiff's due process, equal protection and privacy rights; violated state law as noted below; and engaged in conduct intended to embarrass, humiliate and degrade Plaintiff.

24.     Defendant, David Gier ("Gier"), is the Dean of the School of Music, Theatre, and Dance ("SMTD") at the University of Michigan.  He is sued in his personal and official capacities.

25.     Gier violated Plaintiff's rights when he, among other things, announced at staff and faculty meetings that Plaintiff would never teach at U of M again before any investigation or dismissal proceedings against Plaintiff were initiated or concluded; violated Plaintiff's due process, equal protection and privacy rights; violated state law as noted below; and engaged in conduct intended to embarrass, humiliate and degrade Plaintiff.

26.     Defendant, Gloria Hage ("Hage"), is a Senior Associate General Counsel at the University of Michigan.  She is sued in her personal and official capacities.

27.     Hage violated Plaintiff's rights when she, among other things, on her own and in her official capacity, refused to offer Plaintiff severance in exchange for his resignation; threatened

that things would get ugly if Plaintiff chose not to resign; violated Plaintiff's due process, equal protection and privacy rights; violated state law as noted below; and engaged in conduct intended to embarrass, humiliate and degrade Plaintiff.

28.    Defendant, Martin Philbert ("Philbert"), is a former provost at the University of Michigan who was removed from his administrative position for sexual misconduct and harassment but allowed to retain his tenured professorship.  He is sued in his personal capacity.

29.    Philbert violated Plaintiff's rights when he, among other things, on his own and in his official capacity at the time, allowed an art installation to be exhibited in the lobby of the SMTD which breached Defendants' promises to respect and treat its tenured faculty in a professional manner at all times; violated Plaintiff's due process, equal protection and privacy rights; violated state law as noted below; and engaged in conduct intended to embarrass, humiliate and degrade Plaintiff.

30.    Defendant, Margie Pilsbury ("Pilsbury"), is a Lead Police Officer with U of M's Division of Public Safety and Security.  She is sued in her personal and official capacities.

31.    Pilsbury violated Plaintiff's due process rights when, unbeknownst to Plaintiff, she assisted the Houston, Texas police department with a criminal investigation involving Plaintiff when that investigation did not involve a student, faculty member, or employee of U of M; filed a police report against Plaintiff on behalf of an anonymous student which was denied for lack of evidence; violated Plaintiff's due process, equal protection and privacy rights; violated state law as noted below; and engaged in conduct intended to embarrass, humiliate and degrade Plaintiff.

32.    Defendant, Mark Schlissel ("Schlissel"), is a former President of the University of Michigan.  Schlissel was removed from his administrative position due to sexual misconduct but continues to teach at U of M as a tenured professor in the Department of Molecular, Cellular and Developmental Biology.  He is sued in his personal and official capacities.

33.    Schlissel violated Plaintiff's rights when he, among other things, on his own and in his

official capacity, failed or refused to independently review the findings and conclusions of the hearing committee and Senate Advisory Committee on University Affairs ("SACUA") before recommending Plaintiff's dismissal to the Board of Regents; violated Plaintiff's due process, equal protection and privacy rights; violated state law as noted below; and engaged in conduct intended to embarrass, humiliate and degrade Plaintiff.

34.    Defendant, Elizabeth Seney ("Seney"), currently holds the position of Title IX Coordinator and Gender-Based Misconduct Director at the University of Michigan's Office of Diversity, Equity and Inclusion, formerly known as the Office of Institutional Equity ("OIE") and referred to as OIE throughout this Complaint.  She is sued in her personal and official capacities.

35.    Seney violated Plaintiff's rights when she, among other things, on her own and in her official capacity, initiated an OIE investigation concerning Plaintiff after becoming aware of the email from "Peter Chalke" (discussed below); failed or refused to notify Plaintiff of the OIE investigation; failed to conduct an independent and unbiased investigation in violation of OIE and university procedures and processes; violated Plaintiff's due process, equal protection and privacy rights; violated state law as noted below; and engaged in conduct intended to embarrass, humiliate and degrade Plaintiff.

36.    Defendant, Andrew Lipian ("Lipian"), is an individual who became a personal friend of Plaintiff in 2012 and a voice student in Plaintiff's studio at the SMTD in the fall of 2016. He is sued in his individual capacity.

37.    Lipian violated Plaintiff's rights when he, among other things, intentionally and knowingly provided false and inflammatory information to Defendants about Plaintiff; conspired with others to provide false and inflammatory information about Plaintiff to Defendants; lied about the nature of his relationship with Plaintiff and Plaintiff's husband; and conducted himself in a manner intended to embarrass, humiliate and degrade Plaintiff and adversely impact the

proceedings against him.

38.     All of the events underlying this Complaint occurred in Ann Arbor, Washtenaw County, Michigan.

39.     This Court has federal subject matter jurisdiction pursuant to 28 U.S.C.§ 1331 and 28 U.S.C. § 1343, as well as supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

40.     The amount in controversy exceeds $10,000, exclusive of interest, costs and attorney fees.

## FACTUAL ALLEGATIONS

41.     Plaintiff was hired as a Professor of Music at the SMTD on May 21, 2015 with an effective start date of September 1, 2015.

42.     Prior to hiring Plaintiff, Defendants solicited and received numerous favorable letters of recommendation, conducted an interview with Plaintiff, evaluated Plaintiff's teaching skills and conducted a background check.

43.     In the letter approving Plaintiff's hire, Defendants wrote:

   a. "It was vividly evident in the master class and voice lessons during his recent visit to the school that Mr. Daniels has been the recipient of superb vocal, musical, linguistic and dramatic training and is the master of all these aspects of the vocal art.  Each of the students with whom he worked made significant progress under his astute tutelage."
   b. "Mr. Daniels' impressive and extensive discography and his publicly and critically acclaimed performances have established him as one of the world's foremost vocalists of any voice type. He will undoubtedly recruit outstanding students in all voice categories."

44.     Once hired, both Plaintiff and Defendants agreed, among other things, to abide by the Constitution of the State of Michigan and to discharge their responsibilities to each other to the best of their abilities and in compliance with the process and procedures described in U of M's faculty handbook, Standard Practice Guide and applicable By-Laws.

45.     Plaintiff quickly became a beloved professor as evidenced by these student comments:

   a. "Simply put, Prof. Daniels is the ONLY person in SMTD whom I trust with my voice…"
   b. "Prof. Daniels is the most excellent, brilliant, dedicated, and kindest instructor I have ever

DocuSign Envelope ID: 1E8C76ED-E938-42E4-9E3E-2F2D66D5CE39

had, bar none…"

   c.   "Prof. Daniels is one of the greatest assets of this university…"

   d.   "To say he is among the greatest voice teachers of the day, perhaps the best ever, is to understate his contribution to academia…"

   e.   "Voice lessons are always my favorite classes because they provide me an opportunity to work with a great professional to advance my skills on an individual level…"

   f.   "David Daniels has a real knack for teaching the voice.  He is also refreshingly receptive to my needs and goals as a student."

46.     Per the promises in Plaintiff's offer letter and in compliance with the tenure process and procedures at U of M, Plaintiff's pre-tenure review was approved on May 4, 2017, with a full tenure review occuring during the 2017-2018 promotion/tenure cycle.

47.     On February 1, 2018, SMTD's Executive Committee unanimously approved tenure for Plaintiff.  The approval letter addressed to the former Provost, Defendant Philbert stated:  "it is with a great sense of confidence and our highest enthusiasm that Professor Daniels' candidacy for tenure is fully supported."

48.     On May 7, 2018, Seney asked to meet with Plaintiff regarding two anonymous complaints alleging that Plaintiff had communicated with two SMTD students on a social media app for gay men called Grindr.

49.     During the May 7, 2018 meeting, Seney explained to Plaintiff that OIE was not opening an investigation and had made no determinations or assumptions about the veracity of the complaints.

50.     At the conclusion of the meeting, Seney cautioned Plaintiff about his social media activities so he could avoid interactions with students that might be inappropriate and inconsistent with University policies.

51.     The meeting ended cordially with both Plaintiff and Seney thanking each other for their professionalism.

52.     After meeting with Seney, Plaintiff, of his own accord, met with the SMTD interim Dean, Melody Racine, about his meeting with Seney and the anonymous complaints. Dean Racine also told Plaintiff to be careful in his communications on social media as he could be communicating

with a student without even knowing it.

53.     Based on his conversations with Seney and Dean Racine, Plaintiff believed the matter was concluded.  And, he deleted his Grindr account.

54.     On May 17, 2018 Plaintiff became a tenured professor at the SMTD at U of M.

55.     Plaintiff's tenure appointment was approved by Defendants, specifically Philbert.

56.     According to U of M, "tenure is an essential part of the guarantee of academic freedom that is necessary for University-based intellectual life to flourish…those who receive this investment do so only after rigorous review which establishes that their scholarship, research, teaching, and service meet the standard."

57.     Tenure constitutes an express contract of employment.

58.     Tenure constitutes an implied contract of employment.

59.     One of U of M's core values, applicable to tenured faculty in particular, is an abiding commitment to sustaining a community in which the dignity of every individual is respected highest standards and are congruent with the needs of the University.

60.     Defendants' Bylaw 5.09, in effect during the relevant time period, provided that no person who has been awarded tenure by the Regents may, thereafter, be dismissed, demoted or recommended for terminal appointment without adequate cause and an opportunity for a review.

61.     Former Bylaw 5.09 stated specifically:  "A recommendation of dismissal, demotion, or terminal appointment may be made on the basis of demonstrated misconduct in teaching or research, substantial and manifest neglect of duty, and/or personal conduct that substantially impairs the individual's fulfillment of institutional responsibilities; this includes acts involving moral turpitude or professional or scholarly misconduct."

62.     As to reports alleging discrimination, harassment or a code of conduct violation, U of M prohibits retaliation against the individuals who make a report and against any respondent.

63.     On the morning of July 16, 2018, Defendants received an email from an individual

calling himself Peter Chalke at gadawg197001@yahoo.com, which stated:

a.  "In 2010, a member of your faculty, David Daniels and his husband drugged and raped a young singer.  He never reported it because he was terrified that a famous and successful singer could derail his nascent career.  This rape was a planned and coordinated attack. Daniels and his husband have done this before and have done it since and they choose their prey carefully.  Besides sexual assaults, dozens of young men are unwilling recipients of pictures of Daniels' genitalia.  He's a known serial sexual predator.  The brave young singer has published his story, but has withheld the names of his rapists.  For now.  However, there are exposes in the works which will be published in national news outlets in which the names of Daniels and other predators in the music world will be revealed.  This will in turn empower David Daniels' countless other victims to speak out. And I can promise you they will.  You need to decide which side of history you want to be on - the side of those who covered up crimes and then had their legacies destroyed (like Joe Paterno at Penn State) and the reputation of their institutions damaged, OR the side of those who stood up against sexual assault and abuse. I have now informed you of Daniels' actions.  Many people in the opera & classical world are aware of them and are distancing themselves from Daniels and UM.  Everything you do from now on will be seen either as doing the right thing or engaging in a cover-up.  I hope you do the right thing.  Peter".

64.     "Peter Chalke" is not a real person and the gadawg197001email is an alias.

65.     Upon information and belief the email was sent by an individual named Asad Jafari who is a friend of the "singer".

66.     Upon information and belief, Defendants never verified the identity of "Peter Chalke", or the email address and never spoke with Mr. Jafari.

67.     The email from "Peter Chalke" initially went to the Board of Regents, staff members in the University president's office and selected SMTD faculty and staff.

68.     Upon receipt of the email, Defendants forwarded it to the U of M police department, office of the general counsel, the vice president of U of M, the vice president of communications for U of M, the chief administrative officer for U of M, the executive assistant to the vice president and general counsel for U of M, and the associate vice president for public affairs for U of M.

69.     Plaintiff learned about the email shortly after it was received and contacted the director of communications for SMTD and Dean Racine.

DocuSign Envelope ID: 1F8C76ED-E938-4264-8E2F-2F3D66D5CE39

70.     Plaintiff met with Dean Racine almost immediately and requested a meeting with the U of M police to discuss the email and its content.

71.     Plaintiff (and later his husband) met with Pilsbury starting at approximately 2:00 pm on the same day that the "Peter Chalke" email was received.

72.     By the time Plaintiff met with Pilsbury, she had already, on her own initiative and unbeknownst to Plaintiff, contacted the "singer" herself.

73.     Pilsbury did not inform Plaintiff or his husband that she had spoken with the "singer" before meeting with them.

74.     After Plaintiff and his husband met with Pilsbury, she contacted the Houston, Texas police department and reported on what Plaintiff and his husband had told her.  Pilsbury did this without either Plaintiff or his husband's consent or authorization.

75.     On August 3, 2018, Pilsbury contacted Seney requesting to discuss the "Peter Chalke" email.

76.     Seney's job did not include the investigation of complaints made by individuals outside of or not affiliated with U of M.

77.     On August 9, 2018, Seney opened an OIE investigation on Plaintiff solely because of the "Peter Chalke" email.

78.     Seney did not notify Plaintiff of her investigation.

79.     Seney opened her investigation by sending the following far-reaching and open-ended email to the SMTD student body:

   a.  "I work in the University of Michigan's Office for Institutional Equity (OIE).  OIE addresses matters involving various forms of discrimination and/or discriminatory harassment, and from time to time we contact individuals within particular groups or units in order to learn of any possible concerns related to the climate and educational environment that may fall within OIE's purview.  I'd like to schedule a time to speak with you by phone at your earliest convenience.  Please note that no concerns have been raised about you, but I am contacting you to learn whether you may have or be aware of any concerns of sexual harassment and/or unwelcome attention by faculty within the School of Music, Theatre & Dance."

80.     Seney's open-ended letter was a pretext to attempt to obtain damaging information about Plaintiff without giving him the opportunity to respond.

81.     Upon information and belief, Seney received no responses to her email.

82.     Plaintiff is not aware of any other occasion when Defendants "from time to time" contacted individuals within particular units or groups to inquire as to their climate and educational environment.

83.     On August 22, 2018, the New York Daily News published the "singer's" prepared statement describing his accusations against Plaintiff.

84.     Once the article came out, Lipian reached out to Plaintiff to offer his support and continued friendship and Plaintiff confided in him.

85.     After that, Lipian, seeing an opportunity, turned on Plaintiff.

86.     Lipian, for example, communicated with the "singer" using encrypted emails, and cajoled and encouraged SMTD students to provide false information to Seney and the OIE.

87.     In September 2018, Plaintiff's counsel received a call from Hage suggesting that Plaintiff resign to avoid what she threatened would be an embarrassing and humiliating dismissal/disciplinary process.

88.     During that conversation, Plaintiff's counsel asked if Defendants were planning to offer Plaintiff severance and Hage told her Defendants would never even consider offering Plaintiff a severance package.

89.     Upon information and belief, almost every other tenured faculty member who was asked to resign from U of M received severance pay.

90.     On October 1, 2018, Gier began as Dean of the SMTD.

91.     On October 24, 2018, Lipian filed a complaint against U of M and Plaintiff alleging hostile environment and quid pro quo sexual harassment in violation of Title IX of the Education Amendments of 1972, *as amended*, 20 USC 1681, *et seq*. ("Lipian lawsuit") and included

Plaintiff as a defendant.

92.     Although Plaintiff was later dismissed, he did file an Answer to the Complaint.

93.     In his Answer, Plaintiff stated, among other things, that he and Lipian had been friends since 2012; Lipian was a frequent guest at Plaintiff's home, with or without a specific invitation to be there; Lipian had, of his own accord and free will, behaved in a sexually suggestive manner toward Plaintiff and especially toward Plaintiff's spouse since their meeting in 2012, including dancing at their home clad only in a jockstrap, sending many intimate and romantic text messages and sending photos of himself doing pushups and flexing his muscles; and once Lipian enrolled at U of M, Plaintiff treated Lipian the same as his other voice students.

94.     In November and December 2018, Seney sent follow-up emails to SMTD students.

95.     In those emails Seney added that she was "investigating some concerns that were raised about a member of the University community".  Again, Seney did not describe in any detail what those concerns might be or who they might be about.

96.     In January 2019, Seney sent more emails to SMTD students and in these emails she wrote:  "I am writing because OIE was recently notified that you may have received contact of a sexual nature by a faculty member…please note that it is unclear from the information that was provided to OIE whether you may have concerns about any contact you may have received from a faculty member."

97.     Seney's far-ranging efforts to get "dirt" on Plaintiff were motivated by the "Peter Chalke" email.

98.     Seney's investigation was biased against Plaintiff in that, among other things, she refused to take or consider witness statements of students who supported Plaintiff, and often suggested answers to the questions she posed to student witnesses.

99.     On January 28, 2019, Gier, during a voice faculty meeting, and at a separate meeting of the various SMTD department chairs, announced that: "Professor Daniels will never teach at the

DocuSign Envelope ID: 158C76ED-E938-4264-9E2F-2F3D66D5CE39

University of Michigan again."

100.    Gier's comments violated Plaintiff's contractual rights, and his rights to due process, fair treatment, equal protection, confidentiality and privacy.

101.    Minutes of the faculty meeting are available, but Gier's statement is conspicuously absent.

102.    On January 29, 2019, Plaintiff and his husband were arrested in Ann Arbor because of a criminal complaint against them having been filed in Houston, Texas based on what "Peter Chalke" wrote had occurred in 2010.

103.    After his arrest and on the advice of counsel, Plaintiff invoked his Fifth Amendment rights against self-incrimination.

104.    Plaintiff's invocation of his Fifth Amendment rights meant that he could not make statements to OIE, and later, that he could not testify on his own behalf at his dismissal hearing.

105.    On April 16, 2019, Philbert, who had decision-making authority over Plaintiff and who was, by then, being investigated for sexual harassment and misconduct going back to 2005, approved the exhibition of an art installation that was installed in the SMTD lobby for two weeks.

106.    The SMTD lobby is open to the public as well as to all students, administrators and U of M faculty and staff.

107.    The art installation (which was later disapproved of by the Senate Advisory Committee on University Affairs ("SACUA") had three listening devices, all of which contained a recording of the "singer" reciting his prepared media statement in which he accused Plaintiff and his husband of raping him in 2010.  With each listening device, the "singer's" voice got louder and louder and, at the same time, Plaintiff's salary scrolled across a screen above the listening devices. If a person picked up the third listening device, the "singer's" voice could be heard throughout the SMTD lobby.

108.    The exhibition of the art installation in a public place was intentionally designed to damage Plaintiff's reputation, embarrass and humiliate him and negatively influence Defendants' decision-makers to terminate Plaintiff's tenure, contract and employment with U of M.

109.    Exhibition of the art installation violated Plaintiff's right to fair and unbiased treatment, and publicly humiliated him.

110.    Exhibition of the art installation violated Plaintiff's contractual rights and Defendants' policies and procedures concerning tenured faculty.

111.    Exhibition of the art installation violated Plaintiff's constitutional rights to due process and equal protection and compromised the integrity of the ongoing criminal proceedings in Houston, Texas.

112.    On April 22, 2019, Plaintiff received notice that Defendants were initiating dismissal proceedings pursuant to ByLaw 5.09.

113.    The Notice itself was vague and not specific.

114.    Prior to the dismissal hearing, and while the OIE was investigating Plaintiff, the Michigan Daily ("Daily"), U of M's student-run newspaper, published articles about the accusations being made against Plaintiff including, but not limited to those made by the "singer" who had never been affiliated with or connected to the University.

115.    Neither the Daily nor any of the Defendants provided Plaintiff with an opportunity to respond to what the Daily had published.

116.    Prior to or around the same time that Plaintiff was notified of the initiation of dismissal proceedings, Defendants retained the law firm Hooper Hathaway P.C., to represent SACUA.

117.    Defendants retained Hooper Hathaway P.C. while Plaintiff was a client of the firm and his attorney was an employee of the firm.

118.    Hooper Hathaway maintained all of the Electronically Stored Information ("ESI") regarding Plaintiff, including, but not limited to, privileged and confidential attorney work

product, confidential and protected information regarding the OIE investigations involving Plaintiff, confidential and protected information concerning Plaintiff's criminal prosecution in Houston, Texas, confidential and protected information concerning the lawsuit filed by Lipian, and other information concerning Plaintiff.

119.    All of the above referenced information was available to Defendants, the hearing committee and SACUA.

120.    The dismissal hearing took place on November 11 and 14, 2019.

121.    Prior to, and at the start of the hearing, Plaintiff made numerous objections including that the law firm, Hooper Hathaway P.C., should be recused due to its blatant conflict of interest; the hearing should be adjourned until after the criminal proceedings in Houston, Texas were concluded so Plaintiff could defend himself; the hearing should be adjourned because only three of the required five panel members were present; and Defendants and the hearing committee had access to information that it should not have had.

122.    Defendants' refusal to recuse Hooper Hathaway and their decision to proceed with the hearing even with two members of the hearing panel missing, as well as the prior conduct of Defendants as described above, made it impossible for the dismissal hearing to be independent and unbiased as was required by Defendants' policies and procedures.

123.    Defendants' decision to go forward with the dismissal proceedings despite Plaintiff's objections constituted a breach of Plaintiff's contract, violated his rights to a fair hearing as required by Bylaw 5.09 and other U of M policies and procedures and denied him his constitutional rights to due process and equal protection.

124.    On December 18, 2019, the committee recommended that Plaintiff be dismissed.

125.    The hearing committee determined that all the concerns elicited from students about Plaintiff were credible and refused to balance those against the numerous positive witness statements provided to OIE.

DocuSign Envelope ID: 158C76ED-E938-4264-9E2F-2F2D66D5CE39

126.    The hearing committee refused to consider, or simply ignored, any evidence that was supportive of Plaintiff.

127.    Defendants hid favorable evidence from the hearing committee, including hours of audio of Plaintiff's studio sessions with his students (which show that Plaintiff was consistently professional and respectful of his students and did the job he was hired to do), and supportive witness statements.

128.    Seney testified that in writing up her OIE investigation report she made a calculated choice to include only negative information about Plaintiff because anything positive about him was "inconsequential" to her investigation.

129.    Only two students testified at the dismissal hearing.  One of these students admitted that he had suffered no damage despite communicating with Plaintiff on Grindr and, further, that he, in fact, continued to be friends with Plaintiff on Facebook.

130.    The only other student who testified was a woman who professed to be offended and angry that she would be studying under a professor who had been accused of rape but, at the same time, was angry with Defendants for putting Plaintiff on leave when he was the sole reason she had enrolled at the SMTD.

131.    Lipian did not testify at the dismissal proceedings but Defendants relied on the allegations made in his lawsuit despite OIE's conclusion (in a separate OIE investigation occuring after Lipian filed suit) that Plaintiff had not sexually harassed Lipian.

132.    U of M Standard Practice Guide (SPG) 201.12 describes the type of discipline that may be imposed which can include an oral warning or reprimand, a written warning or reprimand, suspension, disciplinary layoff for a stated time period, or discharge.

133.    Defendants intentionally refused to take into account all of the facts and circumstances available at the time the dismissal decision was made such as the nature of the misconduct, Plaintiff's past record including prior disciplinary action, if any, and years of service.

DocuSign Envelope ID: 1E8C76ED-E938-4264-8E2F-2F2D66D5CE39

134.    Defendants intentionally failed or refused to consider anything other than dismissal despite the fact that Plaintiff had no prior disciplinary action, had received high marks for his teaching abilities from both students and faculty and had, generally, raised the standards of the SMTD voice department.

135.    Defendants failed and refused to consider any action short of dismissal despite OIE's finding that Plaintiff had not sexually harassed or exerted undue influence over Lipian.

136.    As described below, unlike the former provost, former university president and at least two tenured faculty members, Plaintiff did not have a sexual relationship with any SMTD student or subordinate.

137.    At most, Plaintiff had communications of a sexual nature with two SMTD students on Grindr and with one via text.

138.    The Grindr communications were with individuals who did not use their real names on the platform.

139.    The Grindr communications used to support Plaintiff's dismissal were, as Plaintiff learned during the course of the dismissal proceedings, the same communications that had been brought to Seney anonymously back in March of 2018 and the same communications that Seney had told Plaintiff she was not investigating.

140.    As to the student Plaintiff texted with, Plaintiff and the student never met in person and Plaintiff did not have a sexual relationship with him.

141.    Further, the students Plaintiff communicated with on Grindr and via text were not in his voice studio and Plaintiff had no control or authority over them.

142.    U of M did and does not maintain any policies restricting or limiting faculty or staff access to any social media, including but not limited to dating and hook-up apps.

143.    Upon being notified of the committee's dismissal recommendation Plaintiff requested a review per Defendants' policies and procedures.

144.    SACUA conducted its review on January 27, 2020.

145.    Bylaw 5.09 required SACUA to take account of all relevant factors, including consideration of the questions (1) whether the hearing committee observed the procedure prescribed in this subsection, (2) whether the hearing committee accorded a fair hearing, (3) whether the deficiencies or acts of misconduct on which the hearing committee's recommendations are based are related to the charges stated in the first instance as the basis for investigation, (4) whether the proceeding as it developed before the hearing committee involves matters of general university concern, and (5) whether the weight of the evidence, as it appears in the record and as supplemented by any further evidence by the review committee, supports the hearing committee's findings and recommendations.

146.    Further, in reviewing the committee's report, SACUA was free to comment on both the procedure and merits of the case.

147.    On January 29, 2020, SACUA voted 7-2 to recommend upholding the Hearing Committee's recommendation of dismissal and confirmed that the Hearing Committee had granted a fair hearing and followed the procedure prescribed by Bylaw 5.09.

148.    Based on the conduct of the hearing, Defendants' refusal to consider any of Plaintiff's objections, and the conduct of Defendants' as described above, SACUA's recommendation of dismissal was without merit or evidentiary support, constituted a breach of Plaintiff's contract, violated his rights to a fair hearing and violated his constitutional rights to due process and equal protection.

149.    SACUA recommended Plaintiff's dismissal despite stating in its February 5, 2020 written report:

   a.   "We agree with the concerns related to OIE raised in Appendix A of the Hearing Committee Report.  This appendix was, in large part, drafted in response to the extraordinary assertion made by the University that the OIE reports at the core of this case be accepted as unchallengeable evidence, even though the reports contained much that was hearsay or irrelevant."

   b.   "Professor Daniels was placed on leave in response to allegations from an individual

    unaffiliated with the university and from a time prior to his employment at the university. The Office of Institutional Equity then initiated a wide-ranging investigation of Professor Daniels' character and behavior, despite the risk that this might appear to be a fishing expedition and highly disruptive to the unit as a whole."

c. "In the initial charge letter from Dean Gier to President Schlissel initiating the 5.09 dismissal process (dated April 19, 2019), he states: "At a minimum, such conduct constitutes Professor Daniels' intentional refusal to perform his academic responsibilities in the School of Music, Theatre, and Dance.   The University could have been more precise in indicating exactly which portion of the SPG in place at the time of the incidents Professor Daniels violated, and why the sanction of dismissal-and only dismissal- was considered."

d. "SMTD allowed the exhibition of a public art exhibit authored by a student in SMTD that specifically addressed the matter of salary paid to Professor Daniels while he was on suspension.  This exhibit was displayed in the lobby of the Moore Building for two weeks beginning in April 2019, while the investigation was still ongoing and before the charge letter was written."

e. "The AAUP Statement on Procedural Standards in Faculty Dismissal Proceedings states the guidance that, "Except for such simple announcements as may be required…public statements and publicity about the case by either the faculty member or administrative officers will be avoided so far as possible until the proceedings have been completed."

f. "In the University's SPG 201.89-0 on Sexual Harassment, section I on Retaliation states: "The University will take appropriate steps to assure that a person who in good faith reports, complains about, or participates in an informal resolution, or formal investigation of a sexual harassment allegation will not be subject to retaliation. The University will also take appropriate steps to assure that a person against whom such an allegation is made be treated fairly."

g. "In light of these guidelines, SACUA believes that the art installation was insensitive and inappropriate."

h. "While SACUA affirms the Hearing Committee's recommendation of dismissal, this body reiterates the need for the University of Michigan to address the issues raised about the OIE process as expressed prior to and relating to this case."

i. "We remind the University of its obligation to require administrators to uphold the dignity and respect of faculty members who find themselves the subject of an ongoing investigation."

150.    On March 26, 2020, Schlissel, the U of M president at the time, affirmed the dismissal recommendation.

151.    Schlissel did not independently review the dismissal hearing transcripts or the SACUA recommendations and conclusions before making his dismissal recommendation.

152.    Schlissel's affirmation of the dismissal recommendation was a foregone conclusion for the reasons stated above and without merit or evidentiary support.

153.    On  March 26, 2020, the Board of Regents affirmed Plaintiff's dismissal.

154. The Board of Regents did not independently review the dismissal hearing transcripts or the SACUA recommendations and conclusions before voting unanimously to dismiss Plaintiff from his tenured faculty position.

155. A number of individuals, including current and former students and SMTD faculty members, spoke directly to the Board of Regents in support of Plaintiff.

156. The Board of Regents ignored all of these statements and voted to dismiss Plaintiff immediately after the individuals concluded their remarks.

157. Defendants' dismissal of Plaintiff is not supported by the evidence, breached Plaintiff's contract, denied Plaintiff his constitutional rights to equal protection and due process, and destroyed his reputation in the academic community and elsewhere.

158. The dismissal proceedings were a pretext, sham and a coverup of Defendants' real reason for dismissing Plaintiff which was the email from "Peter Chalke".

159. In the summer of 2023, as Plaintiff's criminal trial in Houston, Texas, was scheduled to begin, Lipian's case against U of M was also moving closer to a trial date.

160. In their preparation for trial, defense counsel in Lipian's case against U of M filed a motion to compel production of the video of Lipian dancing in Plaintiff's house clad only in a jockstrap, which was one of the many things Lipian denied doing.

161. Within a month of filing that motion, Lipian's case was settled.

162. Philbert is a hetrosexual male and is similarly situated to Plaintiff.

163. In contrast to Plaintiff, Philbert received radically different treatment.

164. Beginning in 2019, Defendants investigated Philbert for possible sexual harassment and misconduct.

165. At the same time, Philbert was actively involved in Plaintiff's dismissal process.

166. Philbert intentionally engaged in conduct and communications intended to embarrass and humiliate Plaintiff in order to divert Defendants' attention away from his own wrongful conduct.

167.   Philbert did this, by among other things, permitting the prejudicial and defamatory art installation to be exhibited in the SMTD foyer.

168.   Philbert, like Plaintiff, went on administrative leave while his investigation was pending.

169.   Unlike Plaintiff, however, Defendants treated Philbert with the utmost respect and professionalism during the investigation process.

170.   In Philbert's case, the investigation was conducted by an independent third party law firm in contrast to the biased and unfair OIE investigations of Plaintiff.

171.   Neither the Michigan Daily nor any other news organizations published any of the salacious or humiliating details about Philbert until the investigation was completed.

172.   In contrast to Philbert, Defendants did nothing to protect Plaintiff's reputation or status while investigations against him were ongoing and may have even encouraged the publication of information they knew would negatively affect the process.

173.   Philbert's investigation was completed on July 31, 2020 and is available to the public.

174.   Quoting from the Executive Summary section of the 88-page report:

   a.   "In his early years at the University…Philbert harassed women (including graduate students) who worked in his research lab in SPH.  He made comments about women's bodies; redirected conversations with women to the topic of sex; and insisted on getting hugs."
   b.   "In 2005, after Philbert had become Associate Dean for Research at SPH, specific allegations arose that he had engaged in sexual harassment…the research assistant said that Philbert had propositioned her for sex, asked her to marry him, to run away together, and to "have caramel colored babies with him…"
   c.   Philbert served as Dean of SPH for the next six and a half years.  He was generally viewed as successful and was renewed for a second term in 2015…But he sexually harassed several women…He continued making sexual comments around staff and insisting on hugs.  And, he went further with some women-making targeted sexual comments and comments about their appearances.
   d.   "While Dean, Philbert was in sexual relationships with at least three staff members at SPH.  These relationships overlapped-and included sexual relations in University offices and explicit photos that Philbert stored on his University owned devices.
   e.   The research assistant who had alleged sexual misconduct by Philbert back in 2005, re-enrolled in SPH in 2012.  "Afraid that she would run into Philbert, she decided by the spring of 2013 to withdraw from her classes.  She submitted petitions for a tuition refund and removal of the "withdrawal" notation from her transcript, explaining that she had previously been subjected to sexual harassment by Philbert that was causing her to

experience "anxiety, fear, and panic attacks."

f.  "Philbert's misconduct continued as Provost…Among other sexual comments, he told three different women that he wanted to see below their tan lines; told one woman that he was "aching" for her, and that they could have "beautiful coffee-colored babies" together; and told another woman that "if I wasn't married, I would really go after you."

g.  "Philbert also continued to engage in multiple sexual relationships with University employees.  For nearly his entire tenure as Provost, he was in simultaneous sexual relationships with at least two University employees, sometimes more.  He pressed some of these women to send him explicit photos, which he stored on his University-owned devices. And he engaged in sexual contact with them in University offices, including with one woman on a near-daily basis for a time."

h.  On January 16, 2020, President Schlissel received an anonymous letter in which the author stated; "I am writing on behalf of a group of women who have recently connected to corroborate and share our stories of emotional and sexual abuse perpetrated on us within your University by your provost Martin Philbert over the past twenty years."

175.    Philbert was removed from his executive position as Provost in March 2020 but remained on the faculty as a tenured professor until he voluntarily resigned, effective June 30, 2020.

176.    Defendants did not initiate dismissal proceedings against Philbert.

177.    In contrast, Plaintiff did not have a sexual relationship with any of his students or subordinates, did not make sexually inappropriate comments and did not use University owned devices to store explicit photos, yet he was placed in dismissal proceedings.

178.    In contrast to Philbert, whom Defendants protected while he was being investigated, Defendants intentionally conducted themselves in ways that ensured Plaintiff's reputation at U of M and elsewhere was ruined and, as Gier had predicted, that Plaintiff would never teach at U of M again.

179.     In contrast to Philbert, where an independent third-party conducted the investigation, Defendants investigated Plaintiff themselves and, as Seney testified, made a calculated choice to include only negative information about Plaintiff because anything positive about him was "inconsequential".

180.    In contrast to Philbert, Defendants violated Plaintiff's rights to privacy and due process.

181.    In contrast to Philbert, Defendants disregarded its obligation to uphold the dignity and respect of any faculty member who is the subject of an ongoing investigation.

182.   Schlissel is also similarly situated to Plaintiff.

183.   Schlissel is a heterosexual male.

184.   In December 2020, U of M received an anonymous complaint that Schlissel had engaged in an inappropriate sexual relationship with a subordinate.

185.   On January 15, 2022, Schlissel was removed as president of U of M due to his inappropriate sexual relationship.

186.   Schlissel used his U of M email account to communicate with the employee.

187.   In May 2022, Schlissel settled with U of M agreeing to take a one-year leave of absence in exchange for compensation and benefits exceeding $1,000,000.00 and retention of his tenure appointment  at a salary of at least $185,000/year.

188.   Schlissel currently teaches at U of M as a tenured professor in the school of Literature, Science and the Arts, in the Molecular, Cellular and Biology Department.

189.   Defendants have not initiated dismissal proceedings against Schlissel.

190.   Tenured Associate Professor, Yaron Eliav ("Eliav"), is also similarly situated to Plaintiff.

191.   Eliav is a heterosexual male.

192.   In 2008, Eliav was charged with assault and solicitation of prostitution with a U of M student.

193.   Eliav pleaded no contest to a misdemeanor charge of using a computer to commit a crime and received 12 months probation.

194.   Since 2004, Eliav has consistently engaged in sexually inappropriate conduct with his female students.

195.   In October 2022, an anonymous email was sent to Eliav's department listserv entitled "Your Colleague the Rapist" describing Professor Eliav's sexual harassment and sexually inappropriate conduct.

196.   To date, the only consequence of Eliav's sexually inappropriate conduct is that his

promotion to full professor has been delayed.

197.    Defendants have not initiated dismissal proceedings against Eliav.

198.    Pamela Smock ("Smock") is also similarly situated to Plaintiff.

199.    Smock is a heterosexual female.

200.    Smock is a tenured professor of Sociology at U of M.

201.    In Smock's case, OIE conducted an 8 month investigation regarding inappropriate sexual
conduct with students such as entering a student's hotel room and engaging in behavior they
found frightening, discussing her sex life with them and asking a student and the student's spouse
for personal favors.

202.    Smock's discipline was a three-year pay freeze and denial of sabbatical

203.    Smock filed a grievance after being disciplined by U of M.

204.    Smock's grievance was denied.  Philbert upheld the denial.

205.    In a federal court opinion denying Smock's Motion for Summary Judgment and Granting
in Part and Denying in part Defendants' Motion to Dismiss, the court found that Smock was
denied due process as she was not allowed a meaningful opportunity to prepare a defense to the
allegations made against her.

206.    Smock ultimately obtained a settlement which included reinstatement of her eligibility
for sabbatical, being the sole faculty advisor to students, a 1.5% percent merit increase and a
payment of $95,000 in attorney fees and costs.

207.    Defendants did not initiate dismissal proceedings against Smock.

208.    On August 4, 2023, the criminal trial in Houston against Plaintiff, based upon the
accusations made by the "singer" was scheduled to begin.  The delays had been numerous,
including 2 years of COVID restrictions, a change in prosecutors, and the unavailability of
witnesses for the state.

209.    As the jury was waiting, the prosecuting attorney offered Plaintiff a plea deal which

included pleading no contest to reduced charges and deferred adjudication.

210.     Despite all parties agreeing to a plea of no contest, the trial judge refused to allow a "no-contest" plea in his courtroom.

211.     Plaintiff then, as part of the plea bargain, pled guilty to the reduced charges.

212.     After the plea, the judge, Hon. A. Reagan Clark, Houston, Harris County, Texas, stated: "Alright sir, having heard your pleas in this case and having reviewed these papers, the court will not make a finding of guilt today."

213.     The judge continued: "I will grant the plea bargain agreement that the state and your lawyers have agreed to and you have agreed to and I will defer any finding of guilt."

## COUNT I - VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U. S. CONSTITUTION 42 U.S.C. § 1983

*(against the individual defendants for money damages in their personal capacities and injunctive relief in their official capacities)*

214.     Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully restated herein.

215.     The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that "no state shall... deprive any person of life, liberty, or property, without due process of law."

216.     42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by persons acting under the color of law.

217.     "The fundamental requirement of due process is an opportunity to be heard at a meaningful time and in a meaningful manner." *Smock v. Bd. of Regents of the Univ. of Mich.*, 353 F. Supp. 3d 651, 657 (E.D. Mich. 2018)

218.     Defendants acted under color of law when they engaged in the conduct described herein, including, but not limited to: assisting the Houston, Texas police department in its investigation when the matter there had no connection whatsoever to U of M or Plaintiff's employment there;

DocuSign Envelope ID: 158C76ED-E938-4264-8E2F-2F3D66D5CE39

initiating OIE investigations against Plaintiff when no complaints had been made at the time; failing to notify Plaintiff of the OIE investigations; engaging in conduct and communications designed to embarrass and humiliate Plaintiff which also destroyed any possibility that the dismissal proceedings against Plaintiff would be fair and independent; proceeding with the dismissal hearing despite the blatant conflict of interest with Hooper Hathaway; with only three of the five committee members present and with the knowledge that Plaintiff had invoked his Fifth Amendment rights and, therefore, could not present an adequate defense.

219.   Plaintiff had a constitutionally protected property interest in his position as tenured faculty.

220.   Plaintiff had a constitutionally protected liberty interest in his good name and reputation.

221.   Plaintiff was entitled to but did not receive adequate notice or an opportunity to  be heard.

222.   One consequence of Defendants' conduct was the deprivation of Plaintiff's right to engage in his chosen career and to enjoy the privileges of his hard work.

223.   Defendants' actions and conduct outlined herein violated Plaintiff's clearly established constitutional rights, of which any reasonable person in their position would have known; Defendants are therefore not entitled to qualified immunity.

224.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages.

### COUNT II - VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION 42 U.S.C. 1983

*(against the individual defendants for money damages in their personal capacities and injunctive relief in their official capacities)*

225.   Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully restated herein.

226.   The Equal Protection Clause of the Fourteenth Amendment states:  "No State shall ...

deny to any person within its jurisdiction the equal protection of the laws."

227.   As described above, similarly situated individuals were treated differently and more favorably than Plaintiff.

228.   Defendants engaged in intentional and purposeful discrimination against Plaintiff when they dismissed him from employment but did not dismiss the former provost, university president, and at least two tenured professors who all engaged in continuous conduct that was more egregious than any conduct Plaintiff engaged in.

229.   There was no rational basis for the differential treatment.

230.   Plaintiff was treated differently, at least in part, because he is gay man and Defendants are homophobic.

231.    Defendants' actions and conduct outlined herein violated Plaintiff's clearly established constitutional rights, of which any reasonable person in their position would have known; Defendants are therefore not entitled to qualified immunity.

232.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages.

### COUNT III – BREACH OF EXPRESS CONTRACT

**(**against all defendants in their personal and official capacities**)**

233.   Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully restated herein.

234.   As a tenured professor, Plaintiff had a valid and enforceable contract with Defendants.

235.   Plaintiff fully performed his contractual obligations.

236.   Defendants breached its contract with Plaintiff when, among other things and as stated above, they failed to respect his privacy, intentionally and recklessly published embarrassing information about Plaintiff, and decided in the absence of any evidence that Plaintiff would be dismissed and would never teach at U of M again before any investigations of Plaintiff were

DocuSign Envelope ID: 1E8C76ED-E938-4264-9E2F-2F3D66D5CE39

completed, and before dismissal proceedings were even initiated.

237.    Defendants breached their contract with Plaintiff when they failed to protect his reputation; failed to respect him or his position as a tenured professor; failed to protect his reputation and privacy; failed to provide adequate notice of the allegations against him; proceeded with the dismissal hearing when they knew Plaintiff could not defend himself; had access to confidential, attorney work product and other information about Plaintiff that should not have been available to them; and did everything they could to ensure that the dismissal proceedings were not fair or independent.

238.    As a proximate result of Defendants' material breaches of the Plaintiff's contract, Plaintiff has suffered irreparable harm, injury and damages.

## COUNT IV – BREACH OF IMPLIED CONTRACT

**(***against the individual defendants for money damages in their personal capacities and injunctive relief in their official capacities***)**

239.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully restated herein.

240.    As a tenured professor Plaintiff had a valid and enforceable contract with Defendants based on Defendants' policies, practices, guidelines, and representations.

241.    The implied contract included, but was not limited to, the following terms: a commitment to respect the dignity of every individual, to be provided with proper notice and the opportunity to be heard, and to not be retaliated against or treated with disrespect as a respondent to any allegation of sexual harassment or misconduct.

242.    Plaintiff relied on Defendants' policies, practices and representations in performing work for Defendants pursuant to the implied contract.

243.    Plaintiff fully performed all obligations required of him under the implied contract.

244.    Defendants breached its implied contract with Plaintiff when they failed to protect his

DocuSign Envelope ID: 158C76ED-E933-4364-9E2F-2F3D66D5CE39

reputation, failed to respect him or his position as a tenured professor, failed to protect his reputation and privacy, failed to provide adequate notice of the allegations against him, proceeded with the dismissal hearing when they knew Plaintiff could not defend himself, had access to confidential, attorney work product and other information about Plaintiff that should not have been available to them, and did everything they could to ensure that the dismissal proceedings were not fair or independent.

245.    As a proximate result of Defendant's material breaches of Plaintiff's implied contract, Plaintiff has suffered irreparable harm, injury and damages.

### COUNT V – CIVIL CONSPIRACY

**(***against the individual defendants for money damages in their personal capacities and for injunctive relief in their official capacities***)**

246.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully restated herein.

247.    Defendants knowingly and willfully combined, associated, agreed, and acted together, overtly and covertly, to accomplish an unlawful purpose; namely dismissing Plaintiff from his employment with U of M without just cause and in violation of Defendants' policies, guidelines, regulations and procedures.

248.    Specifically, Defendants took overt acts in furtherance of the conspiracy when they, among other things, took the concerted action and engaged in the conduct described above to ensure that Plaintiff was dismissed/terminated from his tenured position.

249.    As a direct and proximate result of Defendants' conspiracy, Plaintiff has suffered damages.

### COUNT VI – Sex Discrimination in Violation of ELCRA, M.C.L. 37.2201 *et seq.*

*(against the defendants for money damages in their personal and official capacities)*

250.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully

restated herein.

251.    Plaintiff is a member of a protected class.

252.    At all relevant times, Plaintiff was an employee and Defendants were employers as defined by ELCRA.

253.    The State of Michigan has waived its Eleventh Amendment sovereign immunity and consented to suit under ELCRA on behalf of Defendants University of Michigan and the University of Michigan Board of Regents, which are arms of the state.

254.    The individual defendants are also liable to Plaintiff under the ELCRA.

255.    Discrimination on the basis of sexual orientation constitutes prohibited sex discrimination under the ELCRA.

256.    Defendants treated Plaintiff less favorably than similarly situated heterosexual tenured professors as described above.

257.    For example, both Philbert and Schlissel retained their tenured appointments after being removed from their administrative positions.

258.    Eliav and Smock were not subjected to dismissal proceedings despite factual evidence that they had engaged in inappropriate sexual conduct or sexual harassment.  .

259.    Defendants subjected Plaintiff to intentional discrimination including, but not limited to, by making and/or permitting unfounded, prejudicial and discriminatory statements about him while at the same time showing  preference for heterosexual professors in the terms and conditions of employment.

260.    But for Plaintiff's sexual orientation, Defendants would not have taken adverse employment actions against him.

261.    Defendants acted willfully.

262.    Sex-based, sexual orientation bias was a motivating factor behind Defendants' conduct all as described above.

DocuSign Envelope ID: 158C76ED-E938-4364-9E2F-2F2D66D5CE39

263.    Sexual orientation bias was a motivating factor behind Defendants' dismissal of Plaintiff from his tenured faculty position.

264.    Defendants applied their policies and procedures in a manner that discriminated against Plaintiff on the basis of sex, causing him serious and unjustified damage.

265.    As a direct and proximate result of Defendants' unlawful actions,  Plaintiff has suffered irreparable harm, injury, and damages.

266.    Plaintiff is entitled to exemplary damages because Defendants engaged   in the above-described conduct with malice and reckless indifference to his protected rights.

### COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*(against all defendants for money damages in their personal capacities  and injunctive relief in their official capacities)*

267.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

268.    Defendants' conduct, as described above, was extreme and outrageous, exceeding all bounds of decency as understood in a civilized society.

269.    Defendants intended to cause Plaintiff severe emotional distress or engaged in conduct so reckless as to demonstrate a substantial lack of concern as to whether such distress resulted.

270.    Defendants deliberately, intentionally, and with reckless disregard for the truth, conducted themselves and themselves in a manner intended to destroy Plaintiff's professional reputation and terminate his employment.

271.    As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff suffered severe emotional distress.

272.    Defendants' actions were willful, wanton and malicious, exhibiting a reckless disregard for Plaintiff's rights, thus entitling Plaintiff to an award of exemplary damages.

DocuSign Envelope ID: 1F8C76ED-E938-4264-9E2F-2F2D66D5CE39

## COUNT VIII – INTERFERENCE WITH BUSINESS EXPECTANCY

*(against all defendants for money damages in their personal capacities  and injunctive relief in their official capacities)*

273.   Plaintiff had a valid business relationship and/or legitimate expectancy of future employment and economic advantage with Defendants, for Plaintiff was a tenured professor.

274.    Defendants were aware of Plaintiff's business relationship and/or expectancy of both continued employment and economic advantage.

275.   As described above, Defendants intentionally interfered with Plaintiff's business relationship and/or expectancy of continued employment through improper and/or illegitimate means.

276.   Defendants' improper and/or illegitimate interference caused Plaintiff's business relationships and/or expectancies to be impaired and/or terminated.

277.   As a direct and proximate result of Defendants' tortious interference, Plaintiff has suffered damages.

## REQUEST FOR RELIEF

WHEREFORE, for all of the above reasons, Plaintiff requests the following relief:

1.   Award Plaintiff actual and compensatory damages to compensate him for his economic and non-economic injuries.

2.   Award Plaintiff punitive and/or exemplary damages because of Defendants' intentional, deliberate, overt, willful, and flagrant conduct against Plaintiff.

3.   Award Plaintiff his attorney fees, costs, and pre- and post-judgment interest incurred in bringing this action.

4.   Grant Plaintiff such other relief as the Court finds just and appropriate under the circumstances.

## Verification Of Plaintiff

I declare that the statements in this complaint are true to the best of my information, knowledge, and belief.

Dated: 6/28/2024

*David Daniels*
David Daniels
Plaintiff

Respectfully submitted,

STACEY LAW PRACTICE

Dated: June 28, 2024

/s/Francyne Stacey
Francyne Stacey (P33225)
*Attorney for Plaintiff*
455 E. Eisenhower Pkwy, Ste 300
Ann Arbor, MI 48108
(734) 821-8088
francyne@staceylawpractice.com

ARBOR LAW PLLC

Dated: June 28, 2024

/s/Jay Mukerji
Jay Mukerji (P83218)
*Attorney for Plaintiff*
455 E. Eisenhower Pkwy, Ste 300
Ann Arbor, MI 48108
(734) 773-0087
attorney@arborlaw.com